

Sealed
Public and unofficial staff access to this instrument are prohibited by court order.

United States Courts
Southern District of Texas
FILED

OCT 1 4 2015

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA, | § | Criminal No. 15 - 548 |
|---|---|---|
| v. | § | |
| | § | UNDER SEAL |
| WARREN DAILEY | § | |
| Defendant. | § | |

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. "Part A" of the Medicare program covered certain eligible home healthcare costs for medical services provided by a home healthcare agency ("HHA") to beneficiaries requiring home health services because of an illness or disability causing them to be homebound. Payments for home healthcare services were typically made directly to a HHA based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiaries directly.

4. Physicians, clinics, and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

5. The Medicare program paid for home health services only if the patient qualified for home healthcare benefits. A patient qualified for home healthcare benefits only if:

   a. the patient was confined to the home, also referred to as homebound;

   b. the patient was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care (or "POC"); and

   c. the determining physician signed a certification statement specifying that:

      i. the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

      ii. the beneficiary was confined to the home;

      iii. a POC for furnishing services was established and periodically reviewed; and

      iv. the services were furnished while the beneficiary was under the care of the physician who established the POC.

6. Medicare regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of

their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the HHA.

7. These medical records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the HHA.

8. Candid Home Health, Inc. ("Candid") was a Texas corporation incorporated on or about 2006, that did business in Harris County, Houston, Texas purportedly providing home health care services to eligible Medicare beneficiaries.

9. Defendant **WARREN DAILEY** ("DAILEY") was a physician specializing in family practice. DAILEY, a resident of Harris County, Texas, who signed authorizations for Candid certifying that Medicare beneficiaries qualified for home health services.

10. Co-Conspirator Ebelenwa Chudy-Onwuugaje ("Chudy") was the owner and director Candid. Chudy was also a registered nurse.

## COUNT 1
### Conspiracy to Commit Healthcare Fraud
### (Violation of 18 U.S.C. § 1349)

11. Paragraphs 1 through 10 are re-alleged and incorporated by reference as if fully set forth herein.

12. From in or around August 2009 through in or around July 2012, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendant

**WARREN DAILEY**

did knowingly and willfully combine, conspire, confederate and agree with Chudy, and others known and unknown to the grand jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as

defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items and services.

### Purpose of The Conspiracy

13. It was a purpose of the conspiracy for defendant **DAILEY,** Chudy and others known and unknown to the grand jury to unlawfully enrich themselves by (a) submitting false and fraudulent claims to Medicare, (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of proceeds from the fraud, and (c) diverting proceeds of the fraud for the personal use and benefit of defendant and his co-conspirators.

### Manner and Means of The Conspiracy

The manner and means by which defendant **DAILEY** and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

14. Chudy maintained a Medicare provider number, which she used to submit claims to Medicare for home health services that were not medically necessary and not provided.

15. Chudy obtained and thereafter maintained sole signature authority for a corporate bank account of Candid, Wells Fargo Bank account number xxxxx6001.

16. Unindicted co-conspirator M.W. was a recruiter/marketer who sold patients and their Medicare billing information to Chudy.

17. M.W. would and did receive cash and checks from Chudy to bring Medicare patients to Candid so that they could receive home health services from Candid even though such services were not medically necessary.

4

18.     **DAILEY** and Chudy would and did make an agreement that Chudy would pay **DAILEY** $400 a month for signed POC forms, regardless of whether the patients needed home health.

19.     Chudy would and did drop off POC forms at **DAILEY'S** office for **DAILEY** to sign.

20.     **DAILEY** would and did sign POCs for Medicare beneficiaries only after Chudy had paid **DAILEY** his monthly fee. **DAILEY** would not sign POC forms until the monthly fee was paid.

21.     The POCs would falsely state that the patients were homebound and that home health was medically necessary without regard for their actual medical conditions, or whether home health care services were medically necessary. **DAILEY** would frequently sign POCs for Medicare beneficiaries who were not under his care.

22.     M.W. recruited and paid beneficiaries C.W. and A.W. for Candid even though they did not need or qualify for home health services. **DAILEY** signed POC forms referring C.W. and A.W. for home health to Candid. C.W. and A.W. did not recognize **DAILEY** and they were not under his care.

23.     **DAILEY** signed POC forms referring beneficiaries M.L., A.C. and L.T. to Candid for home health services. M.L., A.C. and L.T. did not need home health, they did not recognize **DAILEY** and they were not under his care.

24.     Chudy paid defendant **DAILEY** at least approximately $9,200 from in or around August 2009 through in or around September 2011, as shown by checks from Candid's Wells Fargo Bank account xxxxx6001.

25. Once Chudy received the signed POC forms from **DAILEY**, Candid billed Medicare for home health services that were, at times, not provided and were not medically necessary for those beneficiaries.

26. From in or around August 2009 through in or around July 2012, Candid submitted and caused to be submitted fraudulent claims to Medicare by billing for home health services for Medicare beneficiaries when such services were not medically necessary and, in many cases, not provided. As a result, Medicare would pay approximately $3,871,868 to Candid based on claims for home health care services purportedly provided by Candid, when such services were not medically necessary, and, in many cases, not provided. Specifically, Medicare paid Candid $913,620 based on referrals made by **DAILEY** to Candid.

27. After Medicare deposited payments into Candid's bank account, Chudy transferred proceeds of the fraud to defendant **DAILEY**, herself, and their co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2 AND 3
### False Statements Relating to Healthcare Matters
### (Violation of 18 U.S.C. §§ 1035 and 2)

28. Paragraphs 1 through 27 are re-alleged and incorporated by reference as if fully set forth herein.

29. On or about the dates set forth below, in Harris County, in the Southern District of Texas, and elsewhere, defendant

**WARREN DAILEY**

aided and abetted by, and aiding and abetting, others, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and make and use materially false writings and documents, as set forth below, knowing the same to contain materially false, fictitious,

6

and fraudulent statements and entries, in connection with the delivery of and payment for healthcare benefits, items, and services, and in a matter involving a healthcare benefit program, specifically Medicare:

| Count | Medicare Beneficiary | Approximate Dates of Service | Description | Approximate Medicare Payment |
|---|---|---|---|---|
| 2 | C.W. | 11/29/10 through 3/28/11 | Home Health Re-Certification Plan of Care | $2,366.00 |
| 3 | A.W. | 9/15/10 through 1/12/11 | Home Health Certification and Re-certification Plan of Care | $9,382.00 |

All in violation of Title 18, United States Code, Sections 1035 and 2.

## COUNT 4
### Conspiracy to Pay and Receive Healthcare Kickbacks
### (Violation of 18 U.S.C. § 371)

30. Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

31. From in or around August 2009 to in or about July 2012, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendant

**WARREN DAILEY**

did knowingly and willfully combine, conspire, confederate and agree with Chudy and others known and unknown to the grand jury, to commit certain offenses against the United States, that is,

a. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging

7


for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for, and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

      b.     to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare or Medicaid; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of The Conspiracy

32.     It was a purpose of the conspiracy for defendant **DAILEY**, Chudy, and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom Candid submitted claims to Medicare.

### Manner and Means of The Conspiracy

The manner and means by which defendant **DAILEY**, Chudy, and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

33.     Paragraphs 14 through 27 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

## Overt Acts

34.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

a.      On or about August 7, 2009, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

b.      On or about August 31, 2009, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

c.      On or about September 20, 2009 Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

d.      On or about October 21, 2009, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

e.      On or about December 4, 2009, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

f.      On or about December 22, 2009 Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  g. On or about January 28, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  h. On or about March 3, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  i. On or about April 22, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  j. On or about May 20, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  k. On or about July 16, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  l. On or about August 19, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  m. On or about September 20, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  n. On or about October 25, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

  o. On or about November 30, 2010, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

p.  On or about January 31, 2011, Chudy paid defendant **DAILEY** approximately $1,200 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

q.  On or about June 14, 2011, Chudy paid defendant **DAILEY** approximately $1,200 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

r.  On or about August 2, 2011, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

s.  On or about September 19, 2011, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

All in violation of Title 18, United States Code, Section 371.

## COUNT 5

**Payment and Receipt of Healthcare Kickbacks**
**(Violation of 42 U.S.C. § 1320a-7b(b)(1) and (b)(2), 18 U.S.C. § 2)**

35.  Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

36.  On or about the date enumerated below, in Harris County, in the Southern District of Texas, and elsewhere, defendant **WARREN DAILEY** as set forth below, aided and abetted by, and aiding and abetting, others known and unknown to the Grand Jury, did knowingly and willfully solicit, and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and

ordering of any good, item, and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare as set forth below: on or about August 2, 2011, Chudy paid defendant **DAILEY** approximately $400 for signing documents authorizing Medicare beneficiaries to receive home health services from Candid.

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1) and (b)(2) and Title 18, United States Code, Section 2.

### CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

37. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to defendant **WARREN DAILEY** that upon conviction of any Counts in this Indictment, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses, is subject to forfeiture.

38. Defendant **DAILEY** is notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

39. Defendant **DAILEY** is notified that if any of the forfeitable property, or any portion thereof, as a result of any act or omission of defendant or his co-conspirators:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of defendants up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original Signature on File

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

*/s/ Tina Ansari*

TINA ANSARI
ASSISTANT UNITED STATES ATTORNEY